## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| SANQUINETTE PORTERFIELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:17-cv-0939-JEO |
| | ) | |
| ANDREW M. SAUL, | ) | |
| COMMISSIONER OF THE SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Plaintiff Sanquinette Porterfield's second amended complaint alleges

violations of Title V of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.*, by

her employer, Defendant Andrew M. Saul,[1] Commissioner of the Social Security

Administration ("SSA").  (Doc. 39).[2]  Specifically, Porterfield contends she was

discriminated against because of her disability and that Defendant failed to

---

[1] Andrew M. Saul is now the Commissioner of Social Security and automatically substituted as
the proper party in this action.  *See* Fed.R.Civ.P. 25(d).

[2] References to "Doc. __" are to the documents numbers assigned by the Clerk of the Court to the
pleadings, motions, and other materials in the court file, as reflected on the docket sheet in the
court's Case Management/Electronic Case Files (CM/ECF) system.  All evidentiary citations refer
to the document and page number provided by CM/ECF, except for citations to depositions, which
refer to the page number provided on the deposition transcript, and declarations and affidavits,
which refer to the paragraph number in the affidavit and/or declaration.

accommodate her.  (*Id*.).  Now before the court[3] is Defendant's motion for summary judgment.  (Doc. 58).  The motion has been fully briefed (docs. 59, 63, 64), and is now ripe for decision.  After a review of the briefs and evidence, the court concludes that the motion is due to be granted in full.

## I.  SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion," relying on submissions "which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).  Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 324.

At summary judgment, a court views the evidence in the light most favorable to the non-movant.  *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th

---

[3] The parties have consented to the exercise of dispositive jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c).  (Doc. 20).

Cir. 2000).  The court must credit the evidence of the non-movant and draw all justifiable inferences in the non-movant's favor.  *Id*.  Inferences in favor of the non-movant are not unqualified, however.  "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation."  *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) (alteration supplied).  At summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## II.  STATEMENT OF FACTS[4]

Plaintiff began her employment with SSA in 2007.[5]  (Doc. 58-1 ("Porterfield Dep.") at 18).  During the relevant time period, Plaintiff worked as a Teleservice Representative/Customer Service Representative[6] in the TeleService Center.  (*Id*. at 21, 25).  In her position, Plaintiff answered telephone calls from the public.  (Doc.

---

[4] The facts set out below are gleaned from the parties' submissions and are viewed in the light most favorable to the plaintiff.  They are the "facts" for summary judgment purposes only.  They may not be the actual facts.  *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994).

[5] Plaintiff is still employed by Defendant.

[6] At some point during the relative time period, the title of Plaintiff's position changed but the responsibilities did not.

58-2 ("Green Dep.") at 17-18). Her supervisor was George Green during the times relevant to this lawsuit. (*Id*.).

Plaintiff suffers from migraine headaches. She made Defendant aware of her migraines before the events surrounding this lawsuit. She gave Defendant a letter dated May 19, 2014, from her physician stating,

> Mrs. Porterfield is being treated in my office for chronic daily headaches and migraines, these are chronic life-long conditions. Migraines are unpredictable and may flare up from time to time. If the migraines cannot be controlled with the patient[']s medications she may be absent from work.

(Doc. 58-1 at 45). At some point, at the request of Plaintiff, Defendant purchased a special computer screen to help prevent Plaintiff from getting a migraine from her computer at work. (Porterfield Dep. at 87). Additionally, Plaintiff routinely took leave when her medication did not manage her migraines. Defendant never refused Plaintiff leave and designated the leave for her headaches as FMLA leave. (Porterfield Dep. at 71, 72-73, 106).

## A. Leave Policies[7]

SSA has a number of different types of leave, including annual leave, sick leave, and leave without pay ("LWOP"). Annual and sick leave are paid leave of

---

[7] Porterfield submitted the declaration of Pam Posey, the union representative for the TeleService Center. (Doc. 62-18). The declaration details SSA's leave policies. (*See id*.). Defendant contends that the declaration is inadmissible because a better source is the leave policies themselves, some of which are in the record. (Doc. 64 at 5). Defendant also contends that Posey is not qualified to offer her opinions about the scope and effect of the leave policies. (*Id*. at 5-6). The court agrees with Defendant.

absences that are accrued as the employee works.  (Porterfield Dep. at 33-34).

Annual leave may be used for "anything [the employee] wants to use it for," such as

vacations, rest and relaxation, or any other personal reason.  (Porterfield Dep. at 33;

Doc. 62-2 ("Time and Leave Policy") at 1).  Annual leave must be approved in

advance and all accrued leave must be used within a year or it is lost.  (Time and

Leave Policy at 1).  Sick leave may be used for personal illness, medical treatment

or surgery, incapacity due to pregnancy, contagious disease of a family member

requiring care, and the like.  (Time and Leave Policy at 6).  Employees must provide

documentation of any sick leave exceeding three consecutive workdays.  (*Id*.).

Employees may also take advanced paid annual leave and advanced paid sick leave,

up to a certain amount,[8] but the employee had to pay the SSA back through work

within a year.  (*See* Porterfield Dep. at 34-35; Time and Leave Policy at 8).

Employees may also take LWOP under certain circumstances.[9]  Those

circumstances, "consistent with government wide rules and regulations," include:

(1) medical treatment for a disabled veteran; (2) period of service by a reservist or

National Guard member; (3) employee incapacitated from a job-related injury who

is waiting for adjudication of a workers' compensation claim; and (4) FMLA leave.

---

[8] The record is not totally clear what the total amount of advanced leave is available.  The total number of permitted advanced leave is largely irrelevant, however, as no one claims that Plaintiff exceeded the amount.  Instead, the issue is Plaintiff's amount of LWOP.

[9] The policy stresses that LWOP is "not a right which accrues to an employee and may not be demanded by an employee."  (Time and Leave Policy at 9).

(Time and Leave Policy at 10).  The LWOP policy states that "[t]here are no set minimum or maximum amounts of LWOP that may be granted," but "[u]sually no more than 12 months of LWOP should be approved at one time" and it "should be granted in the smallest reasonable amounts according to the individual circumstances, with additional requests submitted by employees as needed."  (Doc. 62-14 at 5).  Porterfield testified that an employee had to use all of his or her paid annual leave and paid sick leave, including advanced annual and sick leave, before the employee could take LWOP.  (Porterfield Dep. at 63-64).

### B.  June 9, 2014 Leave Counseling

On June 9, 2014, Green conducted an interview with Plaintiff regarding her leave situation.  (Porterfield Dep. at 92).  Plaintiff testified that Green told her he was "told to do a leave counseling on [Plaintiff] because [she] had taken too much leave."  (*Id*. at 93).  Green testified the counseling was because of "her leave balance" and "for the leave that she had taken."  (Doc. 58-2 ("Green Dep.") at 54-55).  The "Record of Interview" states that the purpose of the leave counseling interview was to "discuss her leave record and the requirements for requesting and obtaining approved leave in advance."  (Doc. 58-1 at 41).

The "Record of Interview" was written by Green and contains Green's statements allegedly made to Plaintiff during the "leave counseling interview," as well as what Plaintiff calls her "rebuttal."  (Doc. 58-1 at 41-44; Porterfield Dep. at

60, 66). Although not explained to the court by the parties, it appears that Green's comments are in regular font and Porterfield's "rebuttal" is in bold on the document. (*See id*.). According to the "Record of Interview," Green discussed the following topics with Plaintiff, in relevant part:

- Plaintiff's negative sick leave balance was 223.5 hours and her annual leave balance was negative 33 hours. Green said this "leave usage was at a critical stage and [Plaintiff] needs to make an effort to accrue leave." (Doc. 58-1 at 41). Plaintiff does not dispute her leave balances.

- Plaintiff's "frequent use of leave and the manner in which she requests sick leave," including "long periods of sick leave over the past nine (9) months" that had "become a pattern for her since July 2013." (*Id*.). Regarding this alleged pattern, Plaintiff noted her leave for her workers' compensation injuries and that she always supplies documentation when she requests leave. She also noted the letter from her doctor's office. (*Id*. at 41-42).

- Porterfield had taken 79.5 hours of advanced annual leave, with the maximum allowed being 80 hours, and advanced sick leave could only be granted in cases of serious illness or injury. (*Id*. at 41).

- Green explained the process by which Plaintiff should apply for leave, or call-in for leave if it cannot be anticipated. (*Id*. at 42).

- Green discussed the effects of LWOP in that it "can delay with-in-grade increases and slow the accrual of leave." (*Id*.). He explained that LWOP as not a right but may be granted only in certain circumstances, including 12 weeks of FMLA leave. (*Id*. at 43). However, specific documentation is required for FMLA leave. (*Id*.). Plaintiff disputed this statement, "because according to the contract she can provide [Defendant] a letter from [her] doctor that is good for six months at a time." (*Id*.).

Plaintiff testified that Green did not cover all the above with her during the interview, and that is why "when [she] got this write-up, [she] didn't agree with it and [she] rebutted it." (Porterfield Dep. at 66). She did not recall whether Green went over her negative leave balances with her, but she did not dispute that the balances were correct. (*Id*. at 61-65). Plaintiff recalled Green telling her that "they told him that he had to do a leave counseling" with her and that "he didn't think that it was fair because [Plaintiff] had documentation" regarding the reasons for her leave." (*Id*. at 66). Additionally, Green allegedly told the EEOC investigator "that the leave that was discussed [during the leave counseling interview] was the leave she requested for her migraine headaches."[10] (Doc. 62-15 at 8).

The "Record of Interview" was placed in Plaintiff's file. (See Doc. 58-2 at 40). Additionally, Green informed Plaintiff that she had to go to Section Manager Rhonda Groveman for all further requests for LWOP because after an employee used 240 hours of LWOP,[11] the immediate supervisor no longer had authority to grant any further LWOP. (*Id*. at 41).

---

[10] Defendant disputes the admissibility of the EEOC investigator's notes as to what Green allegedly said during the interview. (Doc. 64 at 4-5). Defendant's objections are rendered moot because of the court's conclusion that the leave counseling was not an adverse employment action. Therefore, for present purposes only, the court will consider the statement.

[11] Green stated that as of June 9, 2014, Plaintiff had taken 601.75 hours of LWOP. (Doc. 58-2 at 41).

## C. December 2014 PACS Performance Plan

In December 2014, Plaintiff received her PACS Performance Plan Non-Managers Appraisal. (Doc. 62-13 at 2-4). The performance appraisal ranked Plaintiff in four areas: interpersonal skills; participation; demonstrates job knowledge; and achieves business results. (*Id*.). Plaintiff received a 5 out of 5 in the first three categories. (*Id*. at 2-3). In the final category, however, Plaintiff received a 3 out of 5. (*Id*. at 3-4). The written discussion of this area contains positive comments regarding her work and are nearly identical to the comments from this section in her 2013 performance plan. (*Compare id*. at 3-4 to *id*. at 11). Plaintiff's comments regarding her rating state:

> I totally disagree with this rating, you can not rate me when I'm not here. you can only rate me when I am here. How can you do an outstanding job achieve the agency business result when you are not here to service the American public.

(*Id* at 4). Green told Plaintiff that the reason for her lower rating was because of her leave. (Porterfield Dep. at 81-82).

As a result of this lower score in the last area, Plaintiff's overall rating was a 4.5. (Doc. 62-13 at 2). In the two previous years, her rating was a 5.0. (*Id*. at 6, 10). Plaintiff testified that she received a smaller bonus as a result of this lower rating. (Porterfield Dep. at 81).

## III. DISCUSSION

The Rehabilitation Act prohibits federal agencies from discriminating against any otherwise qualified individual with a disability solely by reason of his or her disability. 29 U.S.C. § 794(a). The standards for determining liability under the Rehabilitation Act are the same standards as the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*. ("ADA").[12] See *Bole v. City of Pell* City, 866 F.3d 1280, 1288 (11th Cir. 2017); *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005); *see also* 29 U.S.C. § 794(a); 42 U.S.C. § 1981(a)(2). However, the burden for establishing causation under the Rehabilitation Act requires proof that the individual was discriminated against "solely by reason of her disability," while the ADA requires a lesser showing of "but for" causation. *Wade v. Florida Dep't of Juvenile Justice,* 745 F. App'x 894, 896 (11th Cir. 2018) (citing *Schwartz v. City of Treasure Island*, 544 F.3d 1201,1212 n.6 (11th Cir. 2008)).

A plaintiff may prove discrimination in two ways - disparate treatment and a failure to make a reasonable accommodation. Disparate treatment involves discriminatory animus or intent and occurs when a disabled individual is treated differently than a non-disabled or less disabled individual because of disability. *See* 42 U.S.C. § 12112(b). By contrast, a failure to make reasonable accommodation

---

[12] "[T]hus, cases involving the ADA are precedent for those involving the Rehabilitation Act." *Ellis*, 432 F.3d at 1326 (citing *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000)).

claim requires no animus and occurs when a covered entity fails to fulfill its affirmative duty to "make reasonable accommodation to the known physical or mental limitations of an otherwise qualified applicant or employee with a disability" without demonstrating that "the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12111(b)(5)(A). Thus, while disparate treatment claims are concerned with policing employers' actions based on invidious discriminatory intent, "[t]he reasonable accommodation requirement is best understood as a means by which barriers to the equal employment opportunity of an individual with a disability are removed or alleviated." 29 C.F.R. § 1630, app. (2003). Here, Plaintiff contends Defendant is guilty of both types of discrimination. The court first addresses the disparate treatment claim and then moves on to her failure to accommodate claim.

## A. Disparate Treatment

A plaintiff may establish a prima facie case of discrimination in two ways: (1) presenting direct evidence of discriminatory intent, or (2) meeting the test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[13] *See Earley v.*

---

[13] The court is mindful that the Eleventh Circuit has clarified that the framework is not the only way for a plaintiff to survive summary judgment in a discrimination case. *See Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). Rather, the plaintiff can survive summary judgement "if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Id.* A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decision-maker. *Id.* Plaintiff, however,

*Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990). Because Plaintiff has not offered the court any direct evidence of discrimination,[14] the court evaluates Plaintiff's disparate treatment claim under the familiar *McDonnell Douglas* framework for proving discrimination through circumstantial evidence. *See id.* This burden-shifting analysis is a three-step process: (1) a plaintiff establishes a prima facie case of disparate treatment; (2) a defendant articulates a legitimate, non-discriminatory reason for the challenged action; and (3) a plaintiff meets the ultimate burden of proof by proffering "sufficient evidence to create a genuine issue of material fact as to whether each of the defendant's proffered reasons is pretextual." *Wascura v. City of South Miami,* 257 F.3d 1238, 1243 (11th Cir. 2001).

### 1. Prima Facie Case

To establish a prima facie case of disability discrimination, a plaintiff must specifically demonstrate: (1) she has a disability; (2) she was a "qualified individual" for the position; and (3) she was subject to unlawful discrimination as a result of her

---

presents her case using the traditional methods of establishing a prima facie case. (Doc. 63 at 15-20).

[14] The court rejects Plaintiff's argument that she presented direct evidence of discrimination. (Doc. 63 at 19-20). Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption." *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998). "Only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of [disability], . . . constitute direct evidence of discrimination." *Van Voorhis v. Hillsborough County Bd. of Cnty. Comm'rs*, 512 F.3d 1296, 1300 (11th Cir. 2008) (internal quotes omitted). The statements allegedly made by Green fall short of this mark.

disability. *Sutton v. Lader*, 185 F.3d 1203, 1207-08 (11th Cir. 1999). To establish the third element, an individual must show that she suffered an adverse employment action because of her disability. *Doe v. Dekalb County Sch. Dist.*, 145 F.3d 1441, 1445 (11th Cir.1998) (ADA case). This third element is the one at issue here.

Defendant argues that Plaintiff cannot establish the third element of her prima facie case for two reasons.[15] First, Defendant contends the leave interview and memorandum were not an adverse employment action because neither resulted in a serious and material change to her employment. (Doc. 59 at 8-10). Second, Defendant asserts that Plaintiff cannot show that Defendant's actions were based solely on her disability. (*Id*. at 10). For the following reasons, the court finds that Plaintiff has established an adverse employment action, but she did not establish that the adverse employment action was based "solely" on her disability.

### a. Adverse Employment Action

To establish an adverse employment action, "an employee must show a serious and material change in the terms, conditions, or privileges of employment . . . as viewed by a reasonable person in the circumstances." *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001). Although proof of direct economic

---

[15] The court notes that Defendant does not argue that Plaintiff was not a qualified individual. The court harbors serious doubts that Plaintiff could establish this essential element of her claim, had it been challenged. Attendance is a central part of any employment. The law does not require an employer to "wait indefinitely for [a plaintiff's] medical conditions to be corrected, especially in light of the uncertainty of cure." *Wood v. Green*, 323 F.3d 1309, 1314 (11th Cir. 2003).

consequences is not required in all cases, "the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment." *Id*. For example, where an employer's allegedly unfounded criticism of an employee's job performance, in the form of job performance memoranda or otherwise, does not constitute a formal reprimand or trigger any tangible form of adverse action such as loss in benefits, ineligibility for promotional opportunities or more formal discipline, such criticism is rarely actionable under Title VII. *Id*. at 1242.

Plaintiff's points to two potential adverse employment actions. She first argues that the leave counseling given to her on June 9, 2014 by Green is sufficient. (Doc. 39 ¶ 17; Doc. 63 18-19). Second, she asserts that her lower PAC rating, which resulted in her receiving a lower bonus, was an adverse employment action. (Doc. 63 at 19). In response, Defendant focuses its argument on the leave counseling and contends that it does not constitute an adverse employment action. (Doc. 59 at 9-10; Doc. 64 at 6-7).

The court agrees with Defendant that the leave counseling was not an adverse employment action. Plaintiff did not present any evidence that the leave counseling amounted to a formal reprimand or triggered any tangible form of adverse action. Instead, Plaintiff retained the same job, same pay rate, same duties, same work hours and same benefits after the counseling. (Porterfield Dep. at 79-82, 85). It did not

affect her ability to apply for promotions.[16] (*Id.* at 82). The only real change she faced after the counseling was that she had to go to a different supervisor to request further LWOP. (*Id.* at 100-01). This change cannot be characterized as material and certainly did not result in any tangible job consequences, especially considering Plaintiff's testimony that she was never denied any leave when she requested it. (*Id.* at 36, 72-73). Further, Plaintiff's attempts to link the leave counseling to the lower PAC rating is not supported by the record. When specifically asked during her deposition whether her Green told her the lower PAC rating was a result of her leave counseling or her leave balance, Plaintiff testified that Green stated "it was because of [her] leave." (Porterfield Dep. at 82). Simply put, Plaintiff did not present any evidence that the leave counseling resulted in any "serious and material change in the terms, conditions or privileges of [Plaintiff's] employment." *Davis*, 245 F.3d at 1239. As such, the court concludes the leave counseling was not an adverse employment action.

That being said, the court concludes that the lower PAC rating was an adverse employment action. Plaintiff testified that her bonus was affected by the lower PAC rating. (Porterfield Dep. at 81). The record is not clear, however, how her bonus

---

[16] Plaintiff's testimony that she did not apply for any promotions because she "felt like [the counseling] was going to hurt my chances" of receiving a promotion is not persuasive. (Porterfield Dep. at 82). Plaintiff presented no evidence that she was qualified for the alleged promotions for which she did not apply.

was affected, but the court can only assume that her bonus was lower than it would have been had she received a higher rating. Regardless, "a bonus is a tangible, quantifiable award, more analogous to one's salary or to a benefit of one's employment. . . . [i]t has a more, direct measurable, and immediate effect." *Lees v. Dynamic Educational Systems, Inc.*, 2008 WL 821997, *11 (M.D. Fla. Mar. 26, 2008) (citations and quotation marks omitted); *see also Orquiola v. Nat'l City Mortg. Co.*, 510 F. Supp. 2d 1134, 1158 (N.D. Ga. 2007) (denial of bonus adverse); *Hudson v. Norfolk So. Ry. Co.*, 209 F. Supp. 2d 1301, 1334 (N.D. Ga. 2001). As such, the court concludes that Plaintiff suffered an adverse employment action when she received a lower PAC rating in December 2014 that affected her bonus.

### b. Solely Because of Her Disability

Plaintiff has one more hurdle to jump to establish her prima facie case under the Rehabilitation Act. She must prove that the adverse employment action was "solely by reason of" her disability. 29 U.S.C. § 794(a). Plaintiff contends she that Green told her she received the lower PAC rating because of her leave for her migraines. (Doc. 63 at 19). If this were the case, the court would agree that Plaintiff satisfied this last element. The problem for Plaintiff is that the evidence does not support her argument.

The Eleventh Circuit applies the plain meaning of the phrase "solely by reason of," and a plaintiff cannot prevail if she shows that her employer based the adverse

employment action partially on her disability and partially on other factors. *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) ("It is not enough for a plaintiff to demonstrate that an adverse employment action was based partly on his disability."). The evidence here establishes that the lower PAC rating was not based "solely" because of Plaintiff's disability. Instead, Plaintiff testified that Green told her she received the lower PAC rating "because of [her] leave." (Porterfield Dep. at 82). While Plaintiff argues that her leave and her disability are one in the same, the evidence does not support that argument. Instead, the record is clear that Plaintiff took leave for a number of different reasons – vacation, leave related to her workers' compensation, FMLA leave for her daughter's asthma, and leave related to her migraines. (*See id.* at 38-39, 45-48, 64-65, 77-78; *see also* Docs. 62-7, 62-8, 62-9, 62-10, 62-11). As such, Plaintiff cannot establish that the adverse employment action was "solely by reason of" her disability, as required by the Rehabilitation Act. 29 U.S.C. § 794(a). Defendant is entitled to summary judgment on Plaintiff's claim of disparate treatment.

### B. Failure to Accommodate

It is well settled that "an employer's failure to reasonably accommodate a disabled individual itself constitutes discrimination under the [Rehabilitation Act], so long as that individual is 'otherwise qualified,' and unless the employer can show undue hardship." *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1262 (11th Cir.

2007) (emphasis omitted); *see also Lucas v. W.W. Grainger, Inc*., 257 F.3d 1249, 1255 (11th Cir. 2001). A reasonable accommodation is one that would allow the employee to perform the essential functions of the job. *Lucas*, 257 F.3d at 1255. However, "a plaintiff cannot establish a claim under the Rehabilitation Act alleging that the defendant discriminated against him by failing to provide a reasonable accommodation unless he demanded such an accommodation." *Gaston v. Bellingrath Gardens & Home, Inc*., 167 F.3d 1361, 1364 (11th Cir. 1999) (citing *Wood v. President and Trustees of Spring Hill College in the City of Mobile*, 978 F.2d 1214, 1222 (11th Cir. 1992)).

Defendant argues that Plaintiff's claim fails for two reasons. First, Defendant contends that Plaintiff failed to make a specific request for accommodation. (Doc. 59 at 14-15). Second, Defendant argues that the accommodation she allegedly requested was unreasonable. (*Id*. at 15-16). The court does not have to address the first argument made by Defendant because the accommodation allegedly requested was unreasonable as a matter of law.

Plaintiff contends that Defendant should have allowed her to be absent as much as needed as an accommodation for her migraines when her medication could not control them. (Doc. 63 at 23). She argues that modifying workplace leave policies is a form of a reasonable accommodation and cites to EEOC Enforcement Guidance Questions. (*Id*.). She also cites Defendant's policy allowing "an unlimited

amount of LWOP," unless it was for an inappropriate purpose, and leave based on her "severe chronic migraine headaches" was not an inappropriate purpose. (*Id*. at 27). As such, Plaintiff concludes that her request was reasonable. The court disagrees.

Although Defendant has a written policy stating "[t]here are no set minimum or maximum amounts of LWOP that may be granted," the pertinent question for the court is whether it would be reasonable to require Defendant to allow Plaintiff to take indefinite amounts of leave, never knowing when that leave would begin or end, based on her migraines. The Eleventh Circuit has repeatedly held that indefinite leave is not reasonable as an accommodation:

> Nothing in the text of the reasonable accommodation provision requires an employer to wait for an indefinite period for an accommodation to achieve its intended effect. Rather, reasonable accommodation is by its terms most logically construed as that which, presently, or in the immediate future, enables the employee to perform the essential functions of the job in question.

*Wood v. Green*, 323 F.3d 1309, 1313 (11th Cir. 2003); *see also Wade*, 745 F. App'x at 897 ("Although a leave of absence might be a reasonable accommodation in some cases, we have held that a request for an indefinite leave of absence, which may allow an employee to work at some uncertain point in the future, is not a reasonable accommodation."); *Adigun v. Express Scripts, Inc.*, 742 F. App'x 474, 477 (11th Cir. 2018) ("[A] request for indefinite leave is unreasonable if it does not allow someone to perform his or her job duties in the present or in the immediate future.");

*Santandreu v. Miami Dade Cty.*, 513 F. App'x 902, 905 (11th Cir. 2013) ("the ADA does not require an employer to provide leave for an indefinite period of time because an employee is uncertain about the duration of his condition.").

Indefinite intermittent leave is essentially what Plaintiff asked for as an accommodation – she seeks to take leave from work whenever she gets a migraine. There is no indication in the record when Plaintiff may get the migraines, or if the migraines are triggered by anything in particular. From what the court can glean from her testimony, as well as the absence forms[17] in the record, the migraines were sporadic and unpredictable. In fact, Plaintiff stated that her doctor could not tell Defendant when she would return when she got a migraine. (*See* Porterfield Dep. at 39). She sometimes called in before work and missed the entire day, and other times she had to leave work early or come in late. (*See id.* at 57-58). Plaintiff had accrued hundreds of hours of annual leave, sick leave, advanced annual leave, advanced sick leave, and LWOP.[18] The letter from her doctor stated that her "daily headaches and migraines" were "chronic life-long conditions" that were "unpredictable" and "may flare up from time to time." (Doc. 58-1 at 45). Plaintiff testified that she believed

---

[17] These forms were submitted by Plaintiff, but there is no explanation in the record from a witness regarding these forms and they are woefully lacking in substance. They were largely meaningless because of the lack of explanation and/or summary of the details regarding her leave during the pertinent time period. It is not the job of the court to go through every leave form to determine the reason for the leave and whether or not the leave is related to the case before it.

[18] Admittedly, not all of this leave was for her migraines.

she was allowed to be out of work until her doctor cleared her to return. (Porterfield Dep. at 40).

Based on the above, the court concludes that Plaintiff's alleged request for indefinite, albeit intermittent, leave as an accommodation for her migraines was unreasonable as a matter of law. As such, Defendant is entitled to summary judgment on Plaintiff's claim of failure to accommodate.

## IV. CONCLUSION

For the foregoing reasons, Defendant Andrew M. Saul, Commissioner of the Social Security Administration, is entitled to judgment as a matter of law on all the claims asserted in Plaintiff's complaint. As such, Defendant's motion for summary judgment (Doc. 58) is due to be granted. A separate order will be entered.

**DATED** this 9th day of December, 2019.

_____
**JOHN E. OTT**
Chief United States Magistrate Judge